# United States Tax Court

T.C. Memo. 2025-1

MATTHEW D. HUTCHESON AND ANNETTE HUTCHESON,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 24959-14.                     Filed January 2, 2025.

————

Matthew D. Hutcheson and Annette Hutcheson, pro se.

*Amy B. Ulmer*, *Gregory Michael Hahn*, *Janice B. Geier*, *Catherine J. Caballero*, and *Nhi T. Luu*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: During 2010 petitioner Matthew Hutcheson was a trustee and fiduciary of two retirement plans, G Fiduciary Retirement Income Security Plan (G Fid) and the Retirement Security Plan and Trust (RSPT). He diverted $5,307,688 from the plans for his personal benefit. He used G Fid's plan assets mainly to pay personal expenses, including the purchase and extensive renovation of petitioners' new home. He used RSPT's plan assets in his efforts to acquire a resort and golf course. By 2011 the transfers were discovered. Ultimately, Mr. Hutcheson was convicted of wire fraud and sentenced to over 17 years' imprisonment.

Respondent determined that petitioners had unreported income equal to the amount that Mr. Hutcheson diverted from G Fid and RSPT plus an additional $10,825 in unreported income from other sources. On July 23, 2014, respondent issued a Notice of Deficiency to petitioners for

[*2] 2010 determining a deficiency of $1,925,264, a section 6651(a)(1)[1] addition to tax of $481,316 for failure to file a return timely, and a section 6663 fraud penalty against only Mr. Hutcheson of $1,443,674. Alternatively, he determined a section 6662(a) accuracy-related penalty against both petitioners.[2] In his Answer respondent decreased the deficiency to $1,842,904, the section 6663 fraud penalty to $1,381,904, and the section 6651(a)(1) addition to tax to $460,726.

The issues before the Court are whether:

1. petitioners had unreported embezzlement income of $5,307,688 from the transfers that Mr. Hutcheson directed from G Fid and RSPT and other unreported income of $10,825. We hold they did;

2. petitioners are liable for a 10% additional tax on an early distribution from a retirement plan under section 72(t). We hold they are liable;

3. petitioners are liable for a section 6651(a)(1) addition to tax for failure to file a return timely. We hold they are liable; and

4. Mr. Hutcheson is liable for a section 6663 fraud penalty or, alternatively, petitioners are liable for a section 6662 accuracy-related penalty. We hold Mr. Hutcheson is liable for the fraud penalty.

## FINDINGS OF FACT

When the Petition was timely filed, Mrs. Hutcheson resided in Idaho, and Mr. Hutcheson was incarcerated in California.[3] Some facts and exhibits have been deemed stipulated under Rule 91(f) including the transcript from Mr. Hutcheson's criminal trial. In their Brief, petitioners repeatedly cite exhibits that were not admitted into the record.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Respondent asserts the section 6662(a) accuracy-related penalty as an alternative penalty only and has not argued that the Court should hold Mrs. Hutcheson liable for that penalty if it finds Mr. Hutcheson liable for the fraud penalty.

[3] At the time of trial, Mr. Hutcheson resided in Idaho.

[*3] I.  *Background*

In 2009 petitioners moved to Idaho and purchased a new home, a farmhouse on five acres for approximately $700,000. Their new home was a significant upgrade from their old home, which they sold for $350,000. On December 1, 2009, petitioners borrowed $233,000 from a private lender. They used approximately $175,000 toward the purchase of their new home and used the remainder to pay personal expenses as well as expenses related to Mr. Hutcheson's fiduciary business (professional expenses).

The terms of the private loan required full repayment by January 17, 2010; and if petitioners did not repay it, the daily interest rate increased from .02% to .33%, the equivalent of an annual interest rate of 120% (noncompounded). Petitioners' lack of funds to repay the loan by its due date precipitated the first transfer from G Fid, as explained further below.

In February 2010 petitioners hired Givens Construction to extensively renovate their new home. Petitioners converted part of the garage to extend the laundry room, remodeled two bedrooms, added a bathroom, added extensive cabinetry, constructed a covered patio with an outdoor barbecue and a kitchenette, added a pool and a hot tub with a mechanical building, added driveways and fencing, and performed extensive landscaping. They also demolished an existing barn and constructed a new two-story barn with a stable, an office, and living quarters that included a family room, a kitchen, a bedroom, and a bathroom. They also constructed a horse-riding arena. Renovations continued through April 2011 when Givens Construction stopped work because petitioners had failed to pay it.

A.  *Mr. Hutcheson's Fiduciary Activities*

Mr. Hutcheson began working as an independent fiduciary in 1994. He has a degree in financial services from the Institute of Business and Finance and pursued a doctorate in the science of law but did not complete the degree requirements. He also held various accreditations and certifications relating to fiduciary responsibilities, retirement plans, and financial management. During his career he held himself out as an expert in fiduciary responsibilities for qualified retirement plans and held symposiums offering training in such services. He has published numerous articles on retirement-plan fiduciary responsibilities. He also was a frequent speaker on topics relating to retirement plans and

[*4] testified before the U.S. Congress about qualified plans, fiduciary obligations, and the need to provide accounting transparency to plan participants.

Mr. Hutcheson was the trustee of G Fid and RSPT under the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in sections of titles 26 and 29 U.S.C.).[4] He also owned two businesses connected with his fiduciary activities: Matthew D. Hutcheson, LLC (Hutcheson LLC), a single-member disregarded entity, and Hutcheson Walker Advisors, LLC (HW Advisors), a partnership for federal tax purposes, which he and Monty Walker co-owned as equal members.

B.    *Overview of G Fid and RSPT*

G Fid and RSPT were multiple-employer retirement plans, and small employers used them for their staffs.[5] As a trustee, Mr. Hutcheson was a fiduciary of the plans. He was responsible for safeguarding plan assets and ensuring that they were invested prudently in accordance with the directives of each plan's trust agreement. In addition to Mr. Hutcheson's role as a trustee, there are four additional key roles under ERISA in the operation of retirement plans: (1) a plan sponsor, (2) a plan administrator, (3) a recordkeeper, and (4) an asset custodian.

During 2010 and 2011 G Fiduciary, LLC, was the plan sponsor and plan administrator of G Fid. HW Advisors served in these roles for RSPT. A plan sponsor creates the retirement plan by adopting the plan documents and establishing a trust to hold the plan assets. The plan sponsor appoints the trustee. A plan administrator is responsible for a plan's administrative tasks such as enrolling new participants, processing distributions, and completing reporting and disclosure requirements.

Aspire Financial Services, LLC (Aspire), was the recordkeeper of both plans. As recordkeeper, Aspire was responsible for maintaining the plans' financial records and preparing participant statements. Finally, Charles Schwab Trust Co. (Charles Schwab) and MG Trust Co. were the asset custodians for G Fid and RSPT, respectively. The asset custodian

---

[4] The Internal Revenue Service (IRS) and the U.S. Department of Labor (DOL) share oversight responsibilities over ERISA plans. *See Flahertys Arden Bowl, Inc. v. Commissioner*, 115 T.C. 269, 272 (2000), *aff'd per curiam*, 271 F.3d 763 (8th Cir. 2001).

[5] Around July 2010 G Fid changed its name to BenefitGuard 401(k) Plan. For simplicity, we refer to the plan as G Fid.

[*5] holds the plan assets. As the asset custodians, Charles Schwab and MG Trust Co. had bank accounts for G Fid's and RSPT's assets (G Fid's account and RSPT's account, respectively). Technically, the plan participants are the owners of the bank accounts. Neither petitioner was a participant in either plan.

In addition to G Fid and RSPT, Mr. Hutcheson was also a fiduciary of a third ERISA retirement plan, National Retirement Security Plan 401(k) (NRSP). Mr. Hutcheson organized NRSP in early 2010. He marketed NRSP as a nationwide retirement plan for small employers that would be managed by regional fiduciaries. Some employers who had been using G Fid as their retirement plan switched to NRSP in 2011. However, NRSP no longer operates, because of Mr. Hutcheson's actions.

National Retirement Security Plan, LLC (NRSP LLC), was NRSP's plan sponsor, and HW Advisors was its plan administrator. Trautman Maher & Associates (Trautman Maher) was its recordkeeper, and TD Ameritrade Trust Co. (TD Ameritrade) was its asset custodian. TD Ameritrade maintained a custodial bank account for NRSP (NRSP's account).

As G Fid's and RSPT's trustees, Mr. Hutcheson signed the plan documents. The plan documents for both plans stated that "[a]ll contributions made to the Plan are made for the exclusive benefit of the Participants and their Beneficiaries, and . . . shall not be used for, nor diverted to," any other purposes.

II.     *Mr. Hutcheson's Transfers from G Fid and RSPT*

    A.     *Transfers from G Fid*

In January 2010 Mr. Hutcheson made the first of a dozen transfers from G Fid's account (G Fid transfers). He directed a transfer of $233,000 from G Fid's account to NRSP's account shortly after the $233,000 private loan became due and used the money to repay the loan directly from NRSP's account. After encountering problems with an attempted second transfer to NRSP's account, he directed all other G Fid transfers to a bank account at West Coast Bank in the name of Pension Liquidity Plan and Trust (PLPT), over which he had signatory authority. PLPT was RSPT's former name. In 2010 RSPT no longer used

[*6] the account.[6] Throughout 2010 the only deposits into the account were G Fid transfers. In total, during 2010 Mr. Hutcheson directed transfers of $2,031,688 from G Fid's account: $1,665,438 to PLPT's account and $366,250 to NRSP's account.

For each transaction Mr. Hutcheson instructed Aspire, G Fid's recordkeeper, to make the transfer, determined the amount of the transfer, and identified which plan participants' accounts to liquidate for the transfer.[7] He instructed Aspire to record that the affected plan participants invested in a "new account . . . 'TDA Mid-Term Interest Bearing (Cash Equiv)'" (TDA investment). The TDA investment was an outside investment under ERISA, meaning that (1) the asset custodian no longer held the assets and (2) the recordkeeper no longer received daily updates on the investment's performance. In contrast, assets held by the asset custodian are referred to as inside investments. The recordkeeper has complete visibility of inside investments and receives daily updates on their performance.

Before the first transfer Mr. Hutcheson told Aspire that the affected plan participants wanted an investment that was not exposed to market volatility. He described the TDA investment as a private, nonpublicly traded cash equivalent that was secure, was adequately collateralized, and had a 14% return. He told Aspire that the 14% return was 2% to 3% higher than the return on G Fid's current money market funds. Before the first transfer Mr. Hutcheson also emailed at least one of the affected plan participants to inform her that he was increasing the plan's cash equivalent holdings for 6 to 12 months because he was concerned with market turbulence.

When Mr. Hutcheson directed each future G Fid transfer, he continued to claim that the plan participants made the TDA investment to mitigate market volatility in the short term. Later, he told Aspire that the plan participants were transitioning toward predominantly cash equivalent investments because the majority were over age 60 and were taking "a defensive posture in the short term." He often told Aspire that a specific G Fid transfer was the last one only to make another transfer when he needed more money for his personal use. On December 23,

---

[6] PLPT changed its name to RSPT in 2006 but did not change the name on the account. Before the first G Fid transfer to PLPT's account, the account balance was $2,189.

[7] Mr. Hutcheson primarily dealt with Michael Gottfried, Aspire's chief operating officer, but on occasion he dealt with others. For simplicity, we refer to all Aspire officials as Aspire.

**[*7]** 2010, Mr. Hutcheson instructed Aspire to liquidate all G Fid's remaining inside investments and to transfer the funds to PLPT's account.

Mr. Hutcheson diverted $2,031,688 from G Fid transfers and used it for his own benefit. Petitioners used at least $1.2 million to purchase and renovate their new home, including $892,000 that they paid directly to Givens Construction from PLPT's account plus the amounts that they used to repay two private loans that they used for the purchase and renovation costs. Typically, Mr. Hutcheson paid Givens Construction on the same day as, or within a week of, taking money from G Fid. Petitioners stopped paying Givens Construction in February 2011 after the G Fid and RSPT transfers were discovered although Givens Construction continued renovation work until April 2011.

Petitioners also used G Fid's plan assets to pay personal expenses, professional expenses, and expenses relating to their efforts to acquire a resort and golf course, which we refer to as resort-related expenses. They paid some expenses directly from PLPT's account but also transferred substantial amounts of money from PLPT's account to two bank accounts over which they had signatory authority: approximately $450,000 to an additional bank account at West Coast Bank in the name of Hutcheson LLC and $23,500 to a Wells Fargo bank account in petitioners' names.

Examples of personal expenses that petitioners paid with G Fid's plan assets are $93,059 to purchase three cars, including one that Mrs. Hutcheson's sister Michelle Spurgeon typically drove; $24,389 for Christmas presents for their family, consisting of a $9,035 tractor for Ms. Hutcheson and $15,354 for a downpayment on four all-terrain vehicles for their four minor children; $11,702 for furniture; $11,916 for fencing; and $15,743 for Costco purchases. They also paid $47,822 to the U.S. Department of the Treasury and made approximately $10,000 in ATM withdrawals.

Examples of professional and resort-related expenses that petitioners paid with G Fid's plan assets are over $45,000 to the consulting firm Principal Strategic Advisors that Mr. Hutcheson hired to assist with the acquisition of the resort and golf course; $24,283 to John Fitzgerald, who worked with Mr. Hutcheson in both his fiduciary activities and the acquisition of the resort and golf course; $26,851 for attorney's fees connected to the resort; $30,000 for attorney's fees connected with Mr. Hutcheson's fiduciary activities; $26,965 in

[*8] professional expenses to Franklin Covey Co.; and $15,587 to Vantage Retirement Services.

### B. *Transfers from RSPT*

Mr. Hutcheson primarily used RSPT's plan assets in his efforts to acquire the resort and golf course. In total he directed two transfers from RSPT totaling $3,276,000.

#### 1. *Formation of Green Valley Holdings, LLC*

In August 2010 Mr. Hutcheson formed Green Valley Holdings, LLC (GVH), to purchase a resort owned by Tamarack Resort LLC (Tamarack), and an adjacent golf course that Tamarack jointly owned with West Mountain Golf and one other person. At that time, Tamarack was in bankruptcy and the resort was a bankruptcy asset. The golf course was not part of the bankruptcy.

Initially Mr. Hutcheson was GVH's sole member. However, shortly after forming GVH, he asked Larry Givens and his two sons Rod and Scott, the owners of Givens Construction, to become members. Petitioners had first mentioned their interest in purchasing the resort to Larry in April 2010 and led him to believe that they had the financial resources to do so. Mr. Hutcheson gave Larry a falsified financial statement that showed that petitioners' net worth was approximately $400 million.

In October 2010 Mr. Hutcheson amended GVH's certificate of organization to remove himself as a member and add Larry. Then in December 2010 he filed a second amendment to the certificate to add himself back as a member and to add Rod, Scott, and Mrs. Hutcheson. Petitioners owned 51% of GVH, and the Givenses owned 49%. The Givenses did not contribute money to GVH in exchange for their membership interests. Mr. Hutcheson made all financial decisions for GVH.

#### 2. *Efforts to Acquire Resort and Golf Course*

Around October 2010 Mr. Hutcheson hired Anthony Scott Turlington of Principal Strategic Advisors to assist with the acquisitions. Mr. Hutcheson represented to Mr. Turlington that petitioners had sufficient net worth to acquire the resort as a personal investment. Mr. Turlington developed a two-part strategy to acquire the resort and golf course: (1) make an offer in bankruptcy for the resort as

[*9] the stalking horse bidder, i.e., the initial bidder that sets the minimum bid so that other bidders could not underbid the price, and (2) purchase a note held by Pacific Continental Bank that was collateralized by the golf course (PCB note).

On November 22, 2010, GVH made a $40 million all-cash offer for the resort in the bankruptcy. The offer required GVH to deposit $250,000 into escrow within three days of its acceptance. Around that time Mr. Hutcheson was also negotiating with Pacific Continental Bank to purchase the PCB note. He had previously attempted to purchase a partial interest in the golf course directly from one of its owners but was unsuccessful; thus he followed Mr. Turlington's advice to purchase the PCB note.

In October 2010 Mr. Hutcheson told Aspire that RSPT planned to make a $3 million investment in real estate. In early December 2010 Mr. Hutcheson asked RSPT's investment advisor Kevin Price to purchase the PCB note with RSPT's plan assets.[8] As the investment advisor, Mr. Price selected and managed the investments that RSPT offered to its plan participants. Mr. Hutcheson described the PCB note to Mr. Price as a short-term investment in a note collateralized by a golf course. He explained to Mr. Price that the investment would likely realize a 13% to 14% return in a matter of weeks. Mr. Price declined to purchase the note, explaining to Mr. Hutcheson that there was no way for him to perform due diligence on the note.

In February 2011, at Mr. Hutcheson's request, the Givenses signed an operating agreement for GVH that Mr. Hutcheson backdated to August 31, 2010. The agreement incorrectly stated that the Givenses and Mrs. Hutcheson contributed money to GVH in exchange for their interests. Around March 2011 Mr. Hutcheson told Larry that he had put together an investment group to purchase the resort. From his conversations with Mr. Hutcheson, Larry understood that petitioners planned to purchase the resort with investor financing but they would purchase the golf course with their own money.

GVH employed Scott and Larry and paid them monthly salaries of approximately $8,000 and $12,000, respectively. It also employed Mrs. Hutcheson's father as a part-time engineer for an annual salary of

---

[8] An ERISA trustee may delegate the responsibility for selecting investments to an investment manager or seek advice from an investment advisor.

[*10] $150,000 and her sister Ms. Spurgeon, but her salary is not in the record. GVH paid these individuals through mid-February 2011.

### 3. *Transfers from RSPT*

After Mr. Price refused to purchase the PCB note as an investment for RSPT, Mr. Hutcheson used RSPT's plan assets to purchase it for GVH without Mr. Price's knowledge. On December 14, 2010, he instructed Aspire to liquidate $3.1 million of RSPT's plan assets and hold the proceeds as cash until Mr. Price provided investment instructions.

Mr. Price was unaware of these representations and had no part in the investment instructions. Mr. Hutcheson directed Aspire to make two transfers from RSPT's account that totaled $3,276,000, and he used most of the money to purchase the PCB note for GVH. The first transfer coincided with GVH's selection as the stalking horse bidder for the resort in bankruptcy. In anticipation of the acceptance of GVH's $40 million offer, Mr. Hutcheson instructed Aspire to transfer $275,000 from RSPT's account to PLPT's account for the $250,000 deposit required under the terms of the offer. He instructed Aspire to credit RSPT's plan participants' accounts with a "new outside investment 'Pacific Continental Bank Fixed Income'" (PCB investment). Once the money was in PLPT's account, Mr. Hutcheson transferred it to GVH's account and then to an escrow account at AmeriTitle (escrow account).

On January 7, 2011, the $40 million offer had not yet been accepted, and Mr. Hutcheson needed the money in the escrow account for another purpose. He instructed AmeriTitle to transfer $121,000 from the escrow account to GVH's account, telling AmeriTitle that he needed it to pay insurance premiums on Tamarack's behalf. On January 11, 2011, Tamarack's bankruptcy case was dismissed, making GVH's offer for the bankruptcy assets moot. The next day Mr. Hutcheson told AmeriTitle that the escrow account was no longer necessary because of the bankruptcy case's dismissal and instructed AmeriTitle to transfer an additional $124,000 from the escrow account to GVH's account, making the total amount transferred from the AmeriTitle escrow account to GVH's account $245,000. During January 2011 petitioners used the money to pay GVH's expenses as well as their personal expenses, including $68,595 for GVH's payroll (mostly their relatives and the Givenses), $54,000 for attorney's fees, $7,096 for health insurance, $15,000 for Principal Strategic Advisors' consulting fees,

[*11] $10,000 for an investment advisor's fees, and $32,753 for another car that Mrs. Hutcheson's father drove.

The second RSPT transfer relates to GVH's purchase of the PCB note. On December 27, 2010, GVH entered into an agreement with Pacific Continental Bank to purchase the PCB note for $3 million. Mr. Hutcheson signed the agreement as GVH's managing member. That same day, Mr. Hutcheson instructed Aspire to transfer $3,001,000 from RSPT's account to an escrow account at AmeriTitle established for GVH's purchase of the PCB note and to credit RSPT's plan participants' accounts with the PBC investment. He told Aspire that he made the investment to avoid "systemic risks in the public markets" and described the PBC investment as having "a buy-back to occur in one month or less." After AmeriTitle transferred the $3 million to Pacific Continental Bank, it recorded GVH as the note's owner.

### 4. *Proof-of-Funds Letter*

As part of the offer for the resort, GVH was required to provide a proof-of-funds letter. Around December 2010 Mr. Hutcheson asked the president of TD Ameritrade to provide a proof-of-funds letter stating that TD Ameritrade would transfer $40 million for the resort's purchase price into escrow upon Mr. Hutcheson's instruction. Mr. Hutcheson had a relationship with TD Ameritrade because it was NRSP's asset custodian. However, TD Ameritrade did not hold $40 million in assets for NRSP or any retirement plan for which Mr. Hutcheson was a fiduciary, for Mr. Hutcheson personally, or for GVH.

After TD Ameritrade refused to provide the letter, Mr. Hutcheson created a falsified proof-of-funds letter dated November 16, 2010, using a falsified letterhead for TD Ameritrade and an unauthorized electronic signature of TD Ameritrade's president. The letter contained an incorrect logo, incorrect address, and incorrect telephone number for TD Ameritrade. Mr. Hutcheson provided the falsified proof-of-funds letter to counsel for Tamarack. Ms. Spurgeon told GVH's attorney that TD Ameritrade provided a proof-of-funds letter. Petitioners wanted to ensure that TD Ameritrade did not learn about the letter, and Mrs. Hutcheson told the attorney by email that "it is important that [TD Ameritrade] not be contacted except by those we deem necessary." She also told the attorney that the funds held by TD Ameritrade belonged to petitioners personally and an unnamed partnership. It is not clear from the record whether the TD Ameritrade letter was produced to the bankruptcy court.

[*12] Although Mr. Hutcheson created the falsified TD Ameritrade letter, on December 16, 2010, he asked William Militello, the owner of Piedmont Investment Advisors, LLC (Piedmont), to provide a proof-of-funds letter. He provided a draft proof-of-funds letter for Mr. Militello to use. Mr. Hutcheson represented to Mr. Militello that he was part of an investment group that included pension plans and high net-worth individuals that planned to purchase real property. He also discussed hiring Piedmont as an investment manager and Mr. Militello as GVH's chief accountability officer with an annual salary of $250,000. Mr. Militello agreed to provide the proof-of-funds letter even though neither Mr. Hutcheson nor GVH had an account with Piedmont. Nor did G Fid, RSPT, or any other retirement plan of which Mr. Hutcheson was a fiduciary.

Mr. Militello wrote a proof-of-funds letter dated December 16, 2010, stating that Mr. Hutcheson had fiduciary authority over a business custodial investment account with Piedmont and that upon Mr. Hutcheson's instruction Piedmont would transfer $40 million to a TD Ameritrade escrow account for the benefit of GVH. The proof-of-funds letter was given to Credit Suisse. Mr. Militello also spoke with Credit Suisse at Mr. Hutcheson's request. Mr. Hutcheson gave Mr. Militello explicit instructions about what to say, including that the source of the $40 million was two large pension plans, Mr. Hutcheson personally, and five other wealthy individuals, and that Mr. Hutcheson had sole discretionary authority over all funds.

5.    *Loss of PCB Note*

In late March 2011 petitioners used the PCB note as collateral for a $425,000 30-day, private loan. Petitioners signed the private loan agreement individually and on behalf of GVH. Mr. Hutcheson told the lender that he had purchased the PCB note with his own money and provided a falsified balance sheet to the lender dated February 1, 2011, showing petitioners' net worth was $61.5 million. The lender took physical possession of the PCB note. Ultimately, petitioners were unable to repay the loan, and the lender retained possession of the note and recorded an assignment.

Mr. Hutcheson transferred $122,402 of the loan proceeds to G Fid's account to enable it to make plan distributions. As discussed further below, Mr. Hutcheson was facing extreme pressure from plan participants as well as Daniel Peterson, an executive with G Fiduciary, LLC, because the G Fid transfers had caused G Fid to be unable to make

[*13] distributions since the beginning of 2011. Mr. Hutcheson wanted to conceal that the source of the $122,402 was a private loan and to hide GVH's connection. He asked the bank making the transfer to G Fid's account to identify himself as the transferor as G Fid's trustee and to take additional steps to hide the source of the money and GVH's involvement.

Petitioners used the remainder of the $425,000 loan to pay personal and professional expenses. Mr. Hutcheson transferred $163,999 to GVH's account, which he used to repay hard-money loans from Hawkes Motors of $125,000 and to pay $11,000 to Larry. He used an additional $68,375 or more to pay other personal and professional expenses.

III.  *Discovery of G Fid and RSPT Transfers*

In early 2011 individuals associated with both G Fid and RSPT began asking questions that led to the discovery that Mr. Hutcheson had taken the plan assets and used them for his own benefit. Mr. Peterson, Mr. Walker, and Mr. Price as well as plan participants asked about the TDA and PCB investments that were listed on plan participants' yearend statements. Some plan participants did not receive their distributions and wanted to know why; other participants realized that they did not benefit from the yearend run-up in the stock market because their plan assets were taken out of the stock market. Others objected to the purported TDA and PCB investments because they did not authorize them.

As detailed further below, Mr. Hutcheson described the TDA and PCB investments as short-term, secure investments that would earn 14% returns and repeatedly promised that the investments would soon be liquidated, but the promised liquidation dates kept passing. He could not repay the money that he had taken from either plan and claimed that he was encountering unanticipated liquidity problems. In fact, he was seeking investors for the resort project without success and had hoped to use the investors' money to repay G Fid and RSPT. As explained further below, over time Mr. Hutcheson failed to answer questions, made false statements, and provided evasive, inconsistent explanations about the TDA and PCB investments and the transfers from G Fid and RSPT, primarily in email communications.

**[\*14]**  A.  *G Fid*

In early 2011 Mr. Peterson asked Mr. Hutcheson about the TDA investment after he began receiving inquiries from G Fid plan participants who did not receive their distributions. Mr. Hutcheson reassured Mr. Peterson that the investment would be liquidated by mid-January. He claimed that TD Ameritrade was G Fid's new asset custodian because he had billing issues with Charles Schwab. He blamed the change in the asset custodian and a lack of communication between Aspire and TD Ameritrade for both G Fid's failure to pay distributions and confusion with the yearend account statements.

By the end of February G Fid still had not paid distributions, which Mr. Hutcheson blamed on the unanticipated illiquidity of the TDA investment. Eventually, Mr. Peterson directly contacted TD Ameritrade about the TDA investment and discovered that TD Ameritrade was not G Fid's asset custodian and that it did not have custody of any of G Fid's plan assets. Mr. Peterson also contacted West Coast Bank about G Fid's transfers into PLPT's account, but it refused to discuss PLPT's account without Mr. Hutcheson's authorization.

Throughout the first part of 2011 Mr. Peterson continued to demand answers from Mr. Hutcheson about how G Fid's plan assets were invested, to explain the TDA investment, to identify the new asset custodian, to provide dates when the TDA investment would be liquidated and G Fid would pay distributions, and to provide a proper accounting of G Fid's plan assets that Mr. Hutcheson had transferred out of Aspire's recordkeeping system. Mr. Hutcheson had not provided any of this information. As mentioned above, in March 2011 Mr. Hutcheson obtained a private loan partly to enable G Fid to pay distributions.

In 2011 some employers switched their retirement plan from G Fid to NRSP. Around June 2011 G Fid needed to transfer approximately $1.95 million in G Fid's plan assets to NRSP, which it was unable to do because Mr. Hutcheson had diverted most of G Fid's plan assets. By June 30, 2011, G Fid had transferred only approximately $43,000 to NRSP. Around July 1, 2011, Mr. Hutcheson instructed Aspire to liquidate G Fid's remaining plan assets and transferred the proceeds to NRSP. However, the total amount of G Fid's plan assets transferred to NRSP is unclear from the record. Mr. Hutcheson falsely represented to Mr. Peterson that G Fid was terminating and merging with NRSP to explain what Mr. Peterson referred to as the plan participants' "missing"

[*15] accounts. However, there was no plan in place to terminate G Fid and move all plan participants to NRSP. Some employers continued to use G Fid. Mr. Peterson identified 36 plan participants whose assets Mr. Hutcheson diverted from G Fid, which Mr. Peterson referred to as "missing."

By June 2011 Mr. Peterson had lost confidence in Mr. Hutcheson. Mr. Hutcheson became increasingly uncooperative, and their relationship became increasingly hostile. Mr. Hutcheson wanted Mr. Peterson to drop the matter completely and terminate their relationship. He even blamed Mr. Peterson for causing the problem, falsely accusing Mr. Peterson of not paying Mr. Hutcheson's fees as well as Aspire's and Charles Schwab's fees. He never mentioned to Mr. Peterson that the TDA investment involved irrevocable trust receipts (ITRs) or a securitized fund.[9]

During summer 2011 G Fid remained unable to pay distributions and plan participants continued to demand answers. From July through September 2011 Mr. Hutcheson continued to make inconsistent claims about how G Fid's plan assets were invested to hide the fact that he had used the plan assets for his personal benefit. From July to September 2011 he offered various explanations to plan participants about how G Fid's plan assets were invested, including that they were invested in an economically targeted investment, invested in a private, fixed-income pool earning an 8.25% return, held by a New York-based investment firm, invested in economic development funds or bonds connected with the Idaho Housing and Finance Association (IHFA), invested in illiquid economic development bonds for the State of Idaho, invested in illiquid bonds held by TD Ameritrade at the personal request of Idaho's governor to promote employment, and were transferred to NRSP. At one point, he even claimed that the TDA investment was a real estate investment to promote job growth in his local community, i.e., to purchase and renovate his new home and employ Givens Construction.

On August 23, 2011, NRSP's recordkeeper Trautman Maher reported Mr. Hutcheson to DOL because G Fid had failed to transfer plan assets to NRSP. Around that same time, at least two G Fid plan

---

[9] A trust receipt is a financial instrument used for a collateralized loan where the borrower has physical possession of the collateral, but the lender retains title to the collateral until the borrower repays the loan. Trust receipts are commonly used by distributors and dealers of expensive goods to obtain inventory, and they repay the loan as they sell the inventory. https://www.investopedia.com/terms/t/trust_receipt.asp (last updated July 1, 2024).

**[\*16]** participants also filed reports with DOL. Within days, Mr. Hutcheson learned that he had been reported and confessed to Mr. Peterson that he had taken the plan assets and that they could not be recovered. However, he did not confess that he had used most of the money to purchase and renovate his house and to pay personal expenses. Rather, he told Mr. Peterson that he invested the plan assets to help the town where he lived.

Mr. Hutcheson called DOL on August 29, 2011, and made false statements to hide the fact that he used G Fid's plan assets for his personal benefit. He stated that others have misunderstood the investment that he made with the plan assets and that he wanted to take prompt action to notify DOL. He insisted that he acted prudently when he made the investments, that he had protected plan participants, but that issues had arisen because the investment was illiquid. He discussed both G Fid and RSPT during the DOL call.

While Mr. Hutcheson told Mr. Peterson that G Fid's plan assets were gone, he continued to make misrepresentations to plan participants. In September 2011 he told four plan participants that G Fid's plan assets would not be transferred to NRSP because NRSP's asset custodian Trautman Maher did not want them and that the plan assets were invested with an Idaho economic development fund with a 14% expected return. It was not until December 2011 that Mr. Hutcheson admitted to two of those plan participants that he used G Fid's assets to renovate his home.

Throughout 2011 Mr. Hutcheson also attempted to keep Aspire in the dark about his personal use of G Fid's plan assets. In March 2011 he told Aspire that G Fid was terminating as an ERISA retirement plan because it was not economically feasible and that its assets would be transferred to NRSP. Finally, in September 2011 Mr. Hutcheson confessed to Aspire that G Fid's plan assets were gone but blamed the loss on the illiquidity of the TDA investment. He did not confess that he used G Fid's plan assets to purchase and renovate his home and to pay personal, professional, and resort-related expenses. Rather, he told Aspire that he was "bamboozled" by an investment adviser who recommended the TDA investment.

B.   *RSPT Transfers*

In early January 2011 Mr. Walker and Mr. Price learned about the alleged PCB investment when reviewing plan documents. Mr.

[*17] Hutcheson told Mr. Price that the PCB note was too compelling to pass up, so he made the investment after Mr. Price refused to. He described the PCB investment to Mr. Walker as a short-term investment to facilitate the purchase of a hotel and golf course. He told Mr. Walker that the hotel and golf course were worth approximately $7 million and were in foreclosure. He mispresented that the purchasers were five retirement plans for which he served as fiduciary. He did not immediately disclose that the PCB investment was the PCB note. He concealed GVH's involvement and that he co-owned GVH. He promised Mr. Walker that the PCB investment would be liquidated in approximately two weeks with a 14% return.

During January 2011 Mr. Walker began to receive inquiries from RSPT plan participants about missed distributions. When the PCB investment was not liquidated by mid-January, Mr. Walker asked about the status of the liquidation so he could inform the plan participants. At that time, he told Mr. Hutcheson that he was not concerned with the viability of the PCB investment. Mr. Hutcheson claimed that there was a delay in the liquidation because an investor backed out on the deal to purchase the PCB investment and that he was looking for a new investor. Later, other plan participants asked Mr. Walker about loans and rollovers that RSPT could not accommodate because of the PCB investment. Others were upset that their plan assets were invested in the PCB investment without their authorization.

From February to June 2011 Mr. Walker continued to pressure Mr. Hutcheson for answers. Mr. Walker understood that the PCB investment was the PCB note. However, Mr. Hutcheson did not disclose any connection with GVH. Mr. Hutcheson made multiple promises that the investment would be liquidated by a specific date, but the liquidation never occurred. He made various excuses for the delay. On June 24, 2011, Mr. Hutcheson told Mr. Walker that the PCB investment had been sold and the proceeds would be transferred by June 28, 2011. Mr. Hutcheson made these same promises and representations to Mr. Price and Aspire. Mr. Hutcheson never mentioned to Mr. Walker, Mr. Price, or Aspire that the PCB investment involved ITRs or a securitized fund.

In June 2011 an independent auditor began an audit of RSPT as required under ERISA. Mr. Walker expressed concern to Mr. Hutcheson about how Mr. Hutcheson would explain the PCB investment. The auditor requested information and documentation relating to the PCB investment and the two AmeriTitle escrow accounts. Mr. Hutcheson did

**[*18]** not provide the requested information despite the auditor's and Mr. Walker's repeated demands.

During July and August 2011 Mr. Hutcheson continued to give inconsistent explanations about the PCB investment to plan participants including that an investment group planned to buy the PCB investment but was unable to obtain access to their funds on account of the 2011 U.S. debt ceiling crisis. He reassured plan participants that the PCB investment was safe because it was collateralized with a note even though he had already lost possession of the PCB note when he failed to repay the $425,000 private loan. He did not disclose to plan participants that the PCB investment was the PCB note and that GVH had purchased it or that he and his wife co-owned GVH. He made similar representations to Aspire.

On August 29, 2011, Mr. Walker (through his attorney) reported Mr. Hutcheson to DOL after Mr. Walker learned that the PCB note was possibly in GVH's name, not RSPT's, and that Mr. Hutcheson might own GVH. Afterwards, Mr. Hutcheson falsified documents to establish that RSPT lent money to GVH and to conceal his ownership of GHV. Around September 2011 he created a promissory note from GVH to RSPT for $3.5 million (GVH note) to evidence the loan and a pledge and security agreement that granted a security interest in GVH's assets to RSPT. He backdated the documents to October 10, 2010. The documents show Larry's signature. Larry did not sign them and had no knowledge of the documents. On September 29, 2011, Mr. Hutcheson gave Mr. Walker a copy of the GVH note and the pledge and security agreement. He also gave Mr. Walker incomplete or false corporate documents for GVH that failed to identify that Mr. Hutcheson was a member.

Later, Mr. Walker obtained the corporate documents and confirmed his suspicion that Mr. Hutcheson co-owned GVH. He confronted Mr. Hutcheson and accused him of engaging in a prohibited transaction, still thinking that Mr. Hutcheson used RSPT's plan assets to make a loan to GVH.[10] Mr. Hutcheson admitted that he owned GVH. He also admitted that he used the PCB note as collateral for the $425,000 private loan, but he falsely stated that he had control over the note, and he did not disclose that he lost possession of the note when he

---

[10] Section 4975(c)(1) defines a prohibited transaction to include a loan between an ERISA plan and a disqualified person, i.e., a fiduciary, a transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan, and an act by a disqualified person who is a fiduciary whereby he deals with the plan's income or assets in his own interest or for his own account. § 4975(c)(1)(B), (D), (E).

[*19] failed to repay the loan. He also claimed that the PCB investment was collateralized by property worth $60 to $70 million.

On October 17, 2011, Mr. Hutcheson reported to the IRS and DOL that he had engaged in a prohibited transaction with RSPT, which he described as a $3,276,000 loan from RSPT to GVH to purchase the PCB note. Around that same time, he claimed that RSPT executed a note receivable in October 2010 for a $3.5 million loan to GVH and that he had directed the $3,276,000 transfer in December 2010 pursuant to the note receivable.

Throughout October to the end of December 2011, Mr. Hutcheson continued to make false statements to RSPT plan participants, including that he was working to sell the PCB investment, that he had found a buyer, that they would earn a 14% return on the investment, and that RSPT would soon make distributions. There was no buyer, and no distributions were made.

IV.    *Continued Negotiations for Resort*

Throughout 2011 Mr. Hutcheson represented to individuals who were connected to G Fid and RSPT that he was trying to liquidate the TDA and PCB investments. In fact, he was seeking financing to purchase the resort and planned to use part of the money to repay the G Fid and RSPT transfers. After Tamarack's bankruptcy case was dismissed, Mr. Hutcheson began negotiating directly with its creditors. The primary creditor was Credit Suisse; it held approximately 84% of the debt. Mr. Militello drafted a new proof-of-funds letter dated January 31, 2011, changing the amount to $27.5 million instead of $40 million. On February 1, 2011, Mr. Turlington gave the proof-of-funds letter to Credit Suisse along with a falsified screen shot of GVH's account dated December 30, 2010, that showed a $40.1 million deposit and a $40.1 million account balance. Mr. Hutcheson created the falsified screenshot. On December 30, 2010, GVH's account had a balance of $55.

In May 2011 Tamarack's creditors agreed to sell the debt to GVH for $52 million and signed a purchase agreement. Mr. Hutcheson did not countersign it because he did not have the financing to close the deal. He continued to pursue funding. He was working with investment bankers to obtain financing without success. In June 2011 as Mr. Hutcheson faced increasing pressure to return the money that he had taken from G Fid and RSPT, he emailed one of the investment bankers

[*20] saying that he needed $10 to $15 million so that he could return the "capital" that he had used to purchase the PCB note.

In July 2011 Mr. Hutcheson applied for an economic development bond from the IHFA. On the bond application, he identified the borrower as Tamarack Recapitalization Fund, LLC, a special purpose entity formed by GVH Idaho, LLC (GVH Idaho), and GV Capital, LLC (GV Capital), as a lender. There is no evidence in the record about these entities. He claimed that GVH Idaho had liens on the resort's property and owned or leased parts of the land. He claimed that GV Capital would provide a short-term loan to purchase the resort and the IFHA bond would be used to repay the loan and to pay the resort's initial operating expenses. If GV Capital actually existed, it did not have the capital to make a short-term loan. Mr. Hutcheson told an IHFA official that he had already invested $22 million in the resort. That was not true. On August 18, 2011, the IHFA board issued an initial resolution for the bond application, which allowed the procedural process for a bond issuance to begin. Ultimately, IHFA did not issue the bond and rescinded the resolution in April 2012, around the time Mr. Hutcheson was indicted.

## V.    *Tax Return and Criminal Trial*

Petitioners filed their 2010 return untimely on February 13, 2012, reporting that they had no tax liability. The return was prepared by a paid preparer. During 2010 Mr. Hutcheson received the following income that petitioners failed to report on their 2010 return: (1) a $1 guaranteed payment from HW Advisors, (2) $2 in ordinary dividends from the Income Fund of America, (3) $7 in capital gain from Vanguard, (4) $1,999 of nonemployee compensation from HWA Management Inc., (5) $5,160 of nonemployee compensation from HW Advisors, and (6) a $3,651 distribution from an individual retirement account (IRA). In addition, petitioners received qualified dividends of $3 and $2 from the Income Fund of America and Europacific Growth Fund, respectively, which they failed to report on their 2010 return. The total unreported income from these sources was $10,825. When Mr. Hutcheson received the IRA distribution, he had not reached the age of 59½.

Around February 2012 Mr. Hutcheson learned that he was under criminal investigation in connection with the G Fid and RSPT transfers. He was indicted in April 2012 and convicted by a jury on 17 counts of wire fraud in July 2013. *United States v. Hutcheson*, No. CR-12-0093 (D. Idaho July 31, 2013); *see* 18 U.S.C. § 1343 (defining wire fraud as

**[\*21]** scheming to defraud or obtain money by false or fraudulent pretenses, representations, or promises by wire services). He was sentenced to over 17 years' imprisonment and ordered to pay criminal restitution of $5,307,688. *Hutcheson*, No. CR-12-0093.

DOL also filed a complaint against Mr. Hutcheson in district court alleging that he wrongfully transferred $3,276,000 from RSPT and used the money for his personal benefit. Complaint, *Solis v. Hutcheson*, No. 12-236, 2012 WL 4813357 (D. Idaho May 15, 2012). The district court ruled in favor of DOL and permanently barred Mr. Hutcheson from serving as a fiduciary of ERISA plans. *See Acosta v. Hutcheson*, 710 F. App'x 310 (9th Cir. 2018).

During the audit, petitioners were uncooperative and failed to respond to requests for information. They also failed to cooperate with respondent to prepare for trial. They failed to engage in the stipulation process, and respondent filed multiple Motions to Compel Stipulations under Rule 91(f), which the Court granted.

OPINION

I.  *Deficiency Determinations*

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that they are erroneous. Rule 142(a)(1); *see Welch v. Helvering*, 290 U.S. 111, 115 (1933). The presumption of correctness applies to the Commissioner's determination of unreported income. However, in cases of unreported income, the Commissioner must introduce substantive evidence that the taxpayer received the unreported income before the presumption attaches. *Hardy v. Commissioner*, 181 F.3d 1002, 1004 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97; *Rapp v. Commissioner*, 774 F.2d 932, 935 (9th Cir. 1985). This requisite evidentiary foundation is "minimal." *Banister v. Commissioner*, T.C. Memo. 2008-201, *aff'd*, 418 F. App'x 637 (9th Cir. 2011). We hold that petitioners had taxable, unreported embezzlement income of $5,307,668 and other income of $10,825, including an IRA distribution of $3,651, for 2010.

Section 61(a) defines gross income as any income from whatever source derived. *See Charley v. Commissioner*, 91 F.3d 72, 73–74 (9th Cir. 1996), *aff'g in part, rev'g in part* T.C. Memo. 1993-558. It is well established that when taxpayers misappropriate money for their personal benefit, the money is gross income under section 61(a). *See James v. United States*, 366 U.S. 213, 219–20 (1961). Misappropriated

**[\*22]** funds are income in the year of receipt even though the taxpayer repays the money in a later year or is ordered to pay restitution. *Id.*; *see Yerkie v. Commissioner*, 67 T.C. 388, 390 (1976); *Davis v. Commissioner*, T.C. Memo. 1991-333; *Hadden v. Commissioner*, T.C. Memo. 1990-578; *Hoffman v. Commissioner*, T.C. Memo. 1989-398, *aff'd*, 936 F.2d 577 (9th Cir. 1991) (unpublished table decision); Treas. Reg. § 1.61-14(a).

Respondent asserts that petitioners had unreported income equal to the amounts of the G Fid and RSPT transfers. ERISA provides the general standards governing the operation of qualified retirement plans and the conduct of their fiduciaries. *See Caton v. Commissioner*, T.C. Memo. 1995-80. The assets of an ERISA retirement plan must be held in trust by a trustee. 29 U.S.C. § 1103(a). The trustee is a fiduciary of the pension plan and must act "solely in the interest of the participants and beneficiaries" with the sole aim of "providing benefits to participants and their beneficiaries" and defraying plan administrative expenses. *Id.* § 1104(a)(1). Thus, an ERISA trustee "must hold legal title to the assets of an employee benefit plan with the intent to deal with these assets solely for the benefit of the members of that plan." *Barboza v. Cal. Ass'n of Pro. Firefighters*, 799 F.3d 1257, 1265–66 (9th Cir. 2015).

When an ERISA trustee misappropriates plan assets for his own use or benefit, the misappropriated amounts are includible in the trustee's gross income. *Bailey v. Commissioner*, T.C. Memo. 2012-96, slip op. at 63, *aff'd sub nom. Bailey v. IRS*, No. 13-1455, 2014 WL 1422580 (1st Cir. Mar. 14, 2014); *Zuckerman v. Commissioner*, T.C. Memo. 1997-21; *Adams v. Commissioner*, T.C. Memo. 1970-104, *aff'd per curiam*, 456 F.2d 259 (9th Cir. 1972). Whether a trustee has misappropriated funds held in trust is a question of fact. *Bailey*, T.C. Memo. 2012-96, slip op. at 63.

In general, a taxpayer has income when he exercises dominion and control over property. However, for a trustee, the fact that a trustee exercises dominion and control over the plan assets does not necessarily make the money income to the trustee. *Id.* Rather, there must be some evidence that the trustee abandoned his fiduciary role, exerted dominion and control over the trust assets, and treated the assets as his own. *Id.*, slip op. at 64. When a trustee appropriates plan assets for his own benefit, he realizes income in the year of misappropriation. *Id.*; *see also Smiley v. Commissioner*, T.C. Memo. 2024-66, at \*28.

Mr. Hutcheson directed transfers of $2,031,688 from G Fid and $3,276,000 from RSPT. He admitted at trial that he directed the

**[\*23]** transfers. Petitioners had complete dominion and control over the assets that Mr. Hutcheson transferred from G Fid and RSPT and used the plan assets for petitioners' benefit, including $1.2 million to purchase and renovate their own house, $3 million in their efforts to acquire a golf course as a personal investment in GVH's name, and $1.2 million to pay other personal, professional, and resort-related expenses.

Mr. Hutcheson was not acting to benefit the plan participants as required by ERISA law. He continues to deny that he committed the crimes that he was convicted of and to deny that he took any assets from G Fid and RSPT and used them for his own benefit. As explained further below, petitioners claim that the money from G Fid that they used to purchase and renovate their home, to buy cars and expense gifts, and to pay their personal expenses was to benefit the community through job growth.

The record clearly and convincingly establishes that Mr. Hutcheson transferred G Fid's and RSPT's plan assets for his own economic benefit and not for the benefit of plan participants. When petitioners moved to Idaho, they adopted a lifestyle above their means and used G Fid's plan assets to finance it. The record also establishes that petitioners wanted to acquire the resort and golf course as a personal investment. They formed GVH to own and operate the resort and golf course, negotiated in GVH's name, and purchased the PCB note in GVH's name. They represented to multiple people that they were investing their own money in the resort and golf course when they were actually using money from RSPT. They also intended to use RSPT's plan assets to fund the required deposit for the $40 million offer before the bankruptcy was dismissed. Mr. Hutcheson needed much more financing for the resort than G Fid and RSPT had in plan assets, and he continued to look for funding. He may have hoped to repay the transfers before anyone discovered them. However, embezzled money is still income even if it is later repaid.[11] *James*, 366 U.S. at 219–20.

---

[11] Petitioners have not argued that the G Fid and RSPT transfers were loans. Even if they had, it is highly unlikely that we would have found them to be bona fide loans, especially in the light of Mr. Hutcheson's fiduciary role, as petitioners did not execute a note, interest was not charged, there was no fixed repayment schedule, there was no collateral, there were no repayments and no reasonable prospect of repayment, neither G Fid nor RSPT had sufficient funds to make required distributions after Mr. Hutcheson took the plan assets for his own use, and petitioners repeatedly

**[\*24]** Petitioners argue that Mr. Hutcheson invested G Fid's and RSPT's plan assets in a nonpublicly traded company called NRSP Management. They claim that the investments were targeted toward job creation and affordable healthcare and that they were in accordance with the plans' investment requirements as set forth in their organizational documents and satisfied ERISA investment requirements. They produced two ITRs as evidence of the alleged investments. They argue that Mr. Hutcheson used G Fid's and RSPT's plan assets to purchase NRSP Management stock and issued two ITRs as financial instruments to identify the stock owned by each plan. They argue that under this arrangement (1) the ITRs and the NRSP Management stock became the plan assets, (2) G Fid and RSPT were beneficial owners of the NRSP Management stock, (3) G Fid and RSPT could have surrendered the ITRs at any time to obtain possession of NRSP Management's stock, and (4) the ITRs defined the amount required to liquidate each plan's investment in NRSP Management. According to this alleged investment scheme, they claim that the plan participants were the beneficial owners of the PCB note, and GVH held only nominal title.

We place no weight on the ITRs because they are likely falsified. During Mr. Hutcheson's criminal proceedings, a witness testified that Mr. Hutcheson asked him to prepare the ITRs in December 2012 and to backdate them to 2010. The district court opined that the ITRs were "fraudulent," "not valid," and did not "pass the smell test." Transcript of Proceedings 72–74, *Hutcheson*, CR-12-0093. Mr. Hutcheson never mentioned the ITRs to Mr. Walker, Mr. Peterson, or the plan participants in the numerous explanations that he gave for the TDA and PCB investments. The facts show that Mr. Hutcheson had the ITRs created after he learned that he was under criminal investigation.

Nor do we believe petitioners' other arguments regarding NRSP Management. The only fact concerning NRSP Management that we find credible is that its articles of organization were filed on December 28, 2010, although we are unsure who filed them. Petitioners make numerous claims about NRSP Management that are not supported by

---

misrepresented Mr. Hutcheson's actions to conceal the fact that he took the money for his own use. *See Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-121; *see also Garavaglia v. Commissioner*, T.C. Memo. 2011-228, slip op. at 59 (applying heightened scrutiny where the role of the alleged borrower suggests the "opportunity to contrive a fictional debt" (quoting *United States v. Uneco, Inc.* (*In re Uneco, Inc.*), 532 F.2d 1204, 1207 (8th Cir. 1976))), *aff'd*, 521 F. App'x 476 (6th Cir. 2013).

**[\*25]** any credible documents in the record. For example, they claim that an independent actuary firm valued NRSP Management at $75 million in 2009. They also claim that NRSP Management issued stock to G Fid and RSPT representing their respective investments that equal G Fid and RSPT transfers. Petitioners claim that they own approximately 93% of NRSP Management. They have produced documents of the stock issuance. However, we place no weight on the documents because we find Mr. Hutcheson is not credible and he likely falsified them. They are undated and unsigned by anyone other than Mr. Hutcheson.

Mr. Hutcheson gave numerous, often contradictory, explanations of the TDA and PCB investments to Mr. Walker, Mr. Price, Mr. Peterson, Aspire, and the plan participants. There is no evidence that he ever mentioned the ITRs or the alleged investment in NRSP Management. Nor did he mention an investment in NRSP Management or the ITRs in October 2011 when he reported to the IRS and DOL that he had engaged in a prohibited transaction with RSPT. Instead, he claimed that the RSPT transfers were loans. Now he claims that RSPT had really invested in NRSP Management all along.

We do not find Mr. Hutcheson credible. Often, his testimony was contradicted by documents in the record and the testimony of credible witnesses. There is no credible evidence in the record that the G Fid and RSPT transfers were invested for the benefit of the plan participants. Mr. Hutcheson abused his position as a fiduciary of G Fid and RSPT to take $5.3 million for his own benefit. We hold that petitioners have embezzlement income of $5,307,688 for 2010.

Respondent also asserts that petitioners had unreported income from other sources of $10,825. Respondent met his evidentiary burden of showing that petitioners received this unreported income. Petitioners did not address these other income sources at trial or in their Brief. Accordingly, we find that petitioners received gross income of $10,825 in addition to their embezzlement income.

II.    *Early IRA Distribution*

Section 72(t) imposes a 10% additional tax on early withdrawals from qualified retirement plans. An early withdrawal is defined as a distribution made before "the date on which the employee attains age 59½." § 72(t)(2)(A)(i). Section 72(t) provides exceptions to the 10% additional tax, and the taxpayer has the burden to establish that the

**[*26]** early distribution falls into a specific statutory exception. *See Bunney v. Commissioner*, 114 T.C. 259, 265 (2000).

During 2010 Mr. Hutcheson was under the age of 59½ years when he received the IRA distribution. Petitioners did not address the early distribution at trial or in their Brief and have not argued that a statutory exception to the additional tax applies. Accordingly, we hold that petitioners are liable for the 10% additional tax.

III. *Failure to File*

Section 6651(a)(1) imposes an addition to tax of 5% of the tax required to be shown on a return for each month for which there is a failure to file a tax return, up to 25% in the aggregate, unless the taxpayer establishes that the failure to file was due to reasonable cause and not due to willful neglect. *See* Treas. Reg. § 301.6651-1(a)(1). Failure to file a return timely is due to reasonable cause if the taxpayer exercised ordinary business care and prudence but nevertheless was unable to file the return timely, typically for reasons outside the taxpayer's control. *See United States v. Boyle*, 469 U.S. 241, 243 (1985); Treas. Reg. § 301.6651-1(c)(1).

Petitioners filed their 2010 return late on February 13, 2012. There is no evidence in the record, and petitioners did not argue, that they had reasonable cause for their failure to file timely. Accordingly, we hold that petitioners are liable for a section 6651(a)(1) addition to tax.

IV. *Fraud Penalty*

Section 6663(a) imposes a penalty of 75% on any portion of an underpayment of tax attributable to fraud. The Commissioner has the burden of proving fraud by clear and convincing evidence. § 7454(a); Rule 142(b). To satisfy his burden, the Commissioner must establish that (1) the taxpayer underpaid his tax and (2) some part of the underpayment was due to fraud. *See Parks v. Commissioner,* 94 T.C. 654, 660–61 (1990). To prove that the taxpayer underpaid his tax, the Commissioner may not rely on the presumption of correctness or a taxpayer's failure to carry his burden of proof. *Id.* However, he may rely on facts deemed admitted to discharge his burden of proof. *Marshall v. Commissioner*, 85 T.C. 267, 272–73 (1985). Once the Commissioner establishes that some portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to a 75% penalty unless the taxpayer establishes that some

[*27] portion of the underpayment is not attributable to fraud. *See* § 6663(a) and (b); *Sadler v. Commissioner*, 113 T.C. 99, 105 (1999).

We find that respondent has established by clear and convincing evidence that Mr. Hutcheson had $5,307,688 in unreported embezzlement income for 2010 and that he fraudulently failed to pay tax on the income.[12] Fraud is established by showing that a "taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." *Clayton v Commissioner*, 102 T.C. 632, 647 (1994); *see also Neely v. Commissioner*, 116 T.C. 79, 86 (2001). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977). It is never presumed or imputed. *Parks*, 94 T.C. at 660. Mere suspicion is not enough to prove fraud. *E.g.*, *Petzoldt v. Commissioner*, 92 T.C. 661, 700 (1989); *Katz v. Commissioner*, 90 T.C. 1130, 1144 (1988).

Fraudulent intent may be established by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of fraud is seldom available. *Petzoldt*, 92 T.C. at 699. The Commissioner satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Parks*, 94 T.C. at 661. We examine the taxpayer's entire course of conduct to establish the requisite intent, and an intent to conceal or mislead may be inferred from a pattern of conduct. *Webb v. Commissioner*, 394 F.2d 366, 379 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81; *Stone v. Commissioner*, 56 T.C. 213, 224 (1971).

Circumstantial evidence of fraudulent intent, often called "badges of fraud," include but are not limited to (1) understating income, (2) keeping inadequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading information to a return preparer, (8) providing testimony that lacks credibility, (9) filing false documents (including false returns), (10) failing to file returns, and (11) dealing in

---

[12] The revenue agent (RA) determined to assert the fraud penalty against Mr. Hutcheson. Before respondent issued the Notice of Deficiency, the RA's immediate supervisor approved the RA's determination in writing as required by section 6751(b). *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, 161 T.C. 104 (2023).

[*28] cash. *See Parks,* 94 T.C. at 664–65; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988); *Morse v. Commissioner*, T.C. Memo. 2003-332, *aff'd*, 419 F.3d 829 (8th Cir. 2005); *see also Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus v. Commissioner,* 99 T.C. 202, 211 (1992). We may also consider a taxpayer's intelligence, education, and tax expertise in determining whether he acted with the requisite fraudulent intent. *See Holmes v. Commissioner*, T.C. Memo. 2012-251, at *31, *aff'd*, 593 F. App'x 693 (9th Cir. 2015).

The following badges of fraud are present in this case. Mr. Hutcheson underreported his income by over $5.3 million, gave implausible or inconsistent explanations of his actions, concealed his use of the embezzled assets, failed to cooperate with tax authorities, engaged in illegal activities that resulted in his conviction and imprisonment, attempted to conceal his illegal activities, provided testimony that lacked credibility, prepared falsified documents and forged signatures, and failed to file a return timely. In addition, Mr. Hutcheson was a sophisticated, educated taxpayer with nearly 20 years of experience as a fiduciary and held himself out as an expert in independent fiduciary services. He sponsored training programs, wrote articles, and spoke frequently about the importance of fiduciary responsibilities including testimony before the U.S. Congress. When he testified before Congress in 2010, he had already embezzled close to $800,000.

As an ERISA fiduciary, Mr. Hutcheson was trusted with millions of dollars of retirement savings. He abused his fiduciary role for his own benefit. He used approximately $1.2 million in plan assets to purchase and renovate petitioners' home in Idaho, clearly living beyond his means. He used substantial amounts of the plan assets to purchase four cars and extravagant gifts. Two of the cars were used by his in-laws. He wanted to acquire the resort and golf course as a personal investment and used $3 million of RSPT's plan assets to purchase the PCB note for GVH. Six months later, he lost possession of the note when he defaulted on the $425,000 private loan.[13] He transferred substantial amounts of

---

[13] In January 2014 an Idaho state court held that RSPT was the owner of the PCB note and that neither GVH nor the private lender had any interest in it. *Ret. Sec. Plan & Tr. v. GVH Holdings, LLC*, No. CV-2013-203C (Jan. 2, 2014) (order). The court also entered a judgment against the debtor of the PCB note for repayment plus interest to RSPT.

[*29] plan assets to bank accounts that he controlled and used the money to pay personal, professional, and resort-related expenses.

Mr. Hutcheson took detailed, deliberate steps to conceal his embezzlement. His embezzlement scheme involved numerous financial institutions and bank accounts. He instructed Aspire to falsify plan documents by creating nonexistent outside investments, TDA and PCB investments. By instructing Aspire to credit the plan participants' accounts with investments outside, he placed the plan assets out of the ERISA recordkeeping system to conceal his personal use of the assets. Fortunately, his scheme was discovered within a year of the first transfer. However, by that time, G Fid had only minimal assets left. It is unclear from the record what percentage of RSPT's plan assets Mr. Hutcheson took.

When the transfers were discovered, Mr. Hutcheson spent most of 2011 making false statements to Mr. Peterson, Mr. Walker, and Mr. Price to conceal that he embezzled the funds and used them for his own benefit. In conversations and in email with these individuals, he repeatedly misrepresented how the plan assets were invested and why the funds were not available to pay distributions. He provided false, inconsistent explanations to his business associates Mr. Peterson and Mr. Walker but never mentioned the ITRs to either of them. Still, he presented these falsified documents to this Court in an attempt to avoid paying tax on his embezzlement income even after the district court found that they were "fraudulent."

Mr. Hutcheson also repeatedly made false statements to plan participants who wanted to know what had happened to their retirements savings. His actions caused the plans to fail to make required distributions. He repeatedly made false promises that the alleged TDA and PCB investments would soon be liquidated and the distributions soon made. However, he was not trying to sell these purported investments; no such investments existed. Instead, he was trying to find financing to purchase the resort and golf course as a personal investment, and possibly to repay the money that he had taken.

Mr. Hutcheson forged and falsified documents. The following forged, backdated, or false documents are in the record: (1) a false financial statement given to Larry showing petitioners' net worth of approximately $40 million, (2) a backdated operating agreement for GVH that falsely states that Mrs. Hutcheson and the Givenses made capital contributions to GVH, (3) a false proof-of-funds letter with a

**[\*30]** forged signature from TD Ameritrade's president, (4) two proof-of-funds letters from Mr. Militello that falsely stated that Piedmont held $27.5 and $40 million custodial accounts for which Mr. Hutcheson was the fiduciary (no account existed), (5) a screenshot of GVH's bank account showing an account balance of $40.1 million when, in reality, the account balance was $55, (6) a false balance sheet that Mr. Hutcheson gave to a private lender showing his net worth was $61.5 million, (7) the IHFA bond application with incorrect or false information, (8) the backdated, false ITRs, and (9) a falsified loan agreement between GVH and RSPT for $3.5 million. Mr. Hutcheson blamed his attorney and the investment banker involved in the financing efforts for telling him to create some of these falsified documents.

In addition to drafting the falsified documents, Mr. Hutcheson made numerous false statements and convinced others to lie on his behalf including, among others, as follows. From the start, he tried to hide his connection with GVH and the resort and golf course from Mr. Walker. He lied to the private lender who lent him $425,000, telling him that he purchased the PCB note with his own money. He persuaded Mr. Militello to provide two false proof-of-funds letters, seemingly with a promise of a job with GVH at a $250,000 annual salary and new business for Piedmont. He instructed several individuals, including the investment bankers he was working with, to make misrepresentations to Mr. Walker and Mr. Peterson on his behalf to conceal how he had used G Fid's and RSPT's plan assets for his personal benefit and to conceal his connection with GVH.

When Mr. Hutcheson finally admitted to Mr. Peterson that G Fid's plan assets were gone in late August 2011, he did so only after he learned that he had been reported to DOL. Even after this confession, he continued to lie to G Fid plan participants about why they were not receiving their distributions. He also falsely claimed to Mr. Walker in September 2011 that he had control of the PCB note when in fact he lost possession of the note when he failed to repay the $425,000 private loan.

Mr. Hutcheson was caught, criminally prosecuted, and found guilty by a jury.[14] The U.S. Court of Appeals for the Ninth Circuit, to which this case is appealable, held:

---

[14] Mr. Hutcheson has not challenged our authority to adjudicate a civil fraud penalty. He was convicted of fraud in a criminal jury trial for the activities resulting

**[\*31]** [T]here is abundant evidence in the record to support [Mr. Hutcheson's] convictions on all counts, including not only his personal use of investors' funds to buy or improve his own property, but also a range of conduct from forged documents and fabricated account balance statements to witness testimony regarding Hutcheson's misleading statements about plan participants' inability to withdraw funds.

*United States v. Hutcheson*, 603 F. App'x 613, 614 (9th Cir. 2015).

On the basis of the totality of the evidence before us, we hold that Mr. Hutcheson willfully and fraudulently intended to evade tax on his unreported income.[15] Accordingly, he is liable for the section 6663 fraud penalty.

In reaching our decision, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

in the case before us. *See Olshausen v. Commissioner*, 273 F.2d 23, 27–28 (9th Cir. 1959), *aff'g* T.C. Memo. 1958-85; *cf. SEC v. Jarkesy*, 144 S. Ct. 2117 (2024).

[15] Respondent has proven that petitioners' underpayment of tax on their unreported embezzlement income is due to Mr. Hutcheson's fraud. Accordingly, petitioners have the burden to prove that any part of the underpayment is not attributable to fraud, e.g., $10,825 in other income. *See Sadler*, 113 T.C. at 105. Petitioners have not offered any basis to distinguish concealment of the embezzled income from their other income. Therefore, the entire underpayment is subject to the 75% fraud penalty.